**2016 BNH 003**        Note:  This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                          Bk. No. 14-11021-BAH
                                                                Chapter 7

Catco Recycling, LLC,
                Debtor

Michael S. Askenaizer,
Chapter 7 Trustee,
                Plaintiff

v.                                                              Adv. No. 15-1012-BAH

Jean Anderson,
                Defendant


*Clifford Gallant, Jr., Esq.*
*Beliveau, Fradette, Doyle & Gallant, PA*
*Manchester, New Hampshire*
*Attorney for Plaintiff*

*Marc L. Van De Water, Esq.*
*Van De Water Law Offices, P.L.L.C.*
*Bow, New Hampshire*
*Attorney for Defendant*


## MEMORANDUM OPINION

## I.  INTRODUCTION

Michael S. Askenaizer, the chapter 7 trustee (the "Trustee") of the bankruptcy estate of

Catco Recycling, LLC ("Catco" or the "Debtor"), has filed a motion (Doc. No. 26) (the

"Motion") seeking summary judgment in his favor against Jean Anderson ("Anderson" or the

"Defendant") with respect to Counts I through VI of his amended complaint (Doc. No. 23) (the

"Complaint").  Specifically, the Trustee seeks a determination that the sum of $7,314, which was

given to the Defendant by Donald Belisle III ("Belisle III"), her son and the sole member of the

Debtor, for the installation of a furnace at her home, was fraudulently transferred within the meaning of 11 U.S.C. §§ 544(b), 548(a)(1)(A), and 548(a)(1)(B) and NH RSA 545-A:4(I)(a), 545-A:4(I)(b)(1),[1] and 545-A:5(I).  The Trustee further seeks a determination that the Defendant is liable for the value of said transfer pursuant to 11 U.S.C. § 550(a).  This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  DISCUSSION

### A.  Summary Judgment Standard

In bankruptcy, summary judgment is governed by Federal Rule of Bankruptcy Procedure 7056, which incorporates Federal Rule of Civil Procedure 56 and its standards into bankruptcy practice.  Weiss v. Wells Fargo Bank, N.A. (In re Kelley), 498 B.R. 392, 397 (B.A.P. 1st Cir. 2013) (citing Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 762 (1st Cir. 1994)); Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56.  Rule 56(a) provides that a movant is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[2]  "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are

---

[1]  In both the Complaint and his memorandum of law in support of the Motion, the Trustee makes reference to RSA 545-A:4(I)(b)(2).  However, upon careful review of the statute and his claims, it appears that the Trustee is really seeking avoidance under RSA 545-A:4(I)(b)(1) in Count IV of the Complaint, not RSA 545-A:4(I)(b)(2).

[2]  Rule 56 was amended in 2010; however, the standard has not changed.  Barton v. Clancy, 632 F.3d 9, 16 n.5 (1st Cir. 2011) (citing the advisory committee notes which state that "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word—genuine 'issue' becomes genuine 'dispute.'"); see also Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 533 (6th Cir. 2012) ("The commentary to Rule 56 cautions that the 2010 amendments were not intended to effect a substantive change in the summary judgment standard.").  Accordingly, case law construing the prior version of Rule 56 is still applicable.

those whose 'existence or nonexistence has the potential to change the outcome of the suit.'"
Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (quoting Tropigas de
Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)).
In assessing the summary judgment record, a court must draw all reasonable inferences in favor
of the non-moving party but is "not obliged to accept as true or to deem as a disputed material
fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the
Court by a party." Torrech-Hernandez v. Gen. Elec. Co., 519 F.3d 41, 47 (1st Cir. 2008); see
Adamson v. Walgreens Co., 750 F.3d 73, 78 (1st Cir. 2014).  The Supreme Court has explained
that "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for
a trial—whether, in other words, there are any genuine factual issues that properly can be
resolved only by a finder of fact because they may reasonably be resolved in favor of either
party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  "[T]he mere existence of
some alleged factual dispute between the parties will not defeat an otherwise properly supported
motion for summary judgment; the requirement is that there be no genuine issue of material
fact." Id. 247-48 (emphasis in original).  "With respect to issues on which the non-movant
would bear the burden of proof at trial, the non-movant … must adduce sufficient evidence to
permit the trier of fact to resolve that issue in his favor. … If the non-movant fails to make the
required showing on such an issue and the issue is a dispositive one, summary judgment is
appropriate." Harrington v. Simmons (In re Simmons), No. 15-9005, 2016 WL 234516, at *3
(1st Cir. Jan. 20, 2016) (citing Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir.
2010)).

### B. Summary Judgment Record

The summary judgment record establishes the following.  The Debtor was in the business
of recycling catalytic converters, other metals, and scrap produced by salvage yards.  On June

3

18, 2013, the Debtor and Rebuilders Automotive Supply, Inc. ("RAS") executed a promissory

note in which the Debtor agreed to pay the lesser of $75,000 or "the aggregate unpaid principal

amount of outstanding advances made" by RAS pursuant to an advance agreement by and

between the parties, which was executed that same date.  Less than a month later, on July 12,

2013, Belisle III, the sole member of the Debtor, and Donald Belisle ("Belisle"), Belisle III's

father and the sole member of Recore Trading Co. LLC ("Recore"), executed a document titled

"Preliminary Purchase And Sale Agreement" (the "P&S Agreement"), which states in its

entirety:

> Preliminary Purchase And Sale Agreement
>
> Seller Donald Belisle III (Catco Recycling)
>
> Buyer Recore Trading Co LLC.
>
> Seller agrees to sell all assets of "Catco
> Recycling" To Buyer including but not limited to
> Peterbilt dump truck, Isuzu box truck, Nissan
> fork lift, Baler, Cat shear, wire stripper misc
> containers and shelving, customer lists,
> company name and rights. Buyer agrees to pay
> seller $150,000.00 total with $50,000.00 due at
> signing, $50,000.00 due in 60 days and the
> balance of $50,000.00 due in 120 days. This
> agreement is preliminary and will be
> superseded by final agreement when it is
> prepared by buyers attorney.
>
> Seller _____     Donald BelisleIII
> Buyer _____     Donald Belisle

On July 12, 2013, pursuant to the P&S Agreement, Recore Trading issued and delivered

to Belisle III the first $50,000 payment due under the P&S Agreement.  The check was made

payable to Belisle III, instead of the Debtor, at Belisle III's request.[3]  Nonetheless, the check was deposited into the Debtor's only bank account.  On or about the date the P&S Agreement was executed, the Debtor ceased operating and Belisle III became a full time employee of Recore Trading.  Belisle III began earning a salary of $2,000 per week.

On July 13, 2013, Belisle III withdrew $50,000 from the Debtor's bank account in the form of an official bank check for $45,000 and $5,000 in cash.  Belisle III used that money to purchase a truck for $52,000; title was taken in Belisle III's name.

On July 18, 2013, the Debtor, through Belisle III as the Debtor's managing member, executed and delivered to RAS a security agreement granting to RAS "collateral security for the payment and performance of the obligations contained in the Note and Advance Agreement," which the parties had executed the month before.

On July 25, 2013, Belisle III, on behalf of the Debtor, wrote to Charles Zoulias ("Zoulias"), the Debtor's landlord since October 2011, to inform him that the Debtor had vacated its leased premises due to "black mold" issues; Belisle III also mentioned that he "needed to take the necessary precautions to keep my business going."  On September 10, 2013, Zoulias, through his counsel, issued letters to the Debtor and Belisle III (each of whom was described as a "lessee") demanding payment for past due rent and damages to the leased premises in the total amount of $37,430.

Sometime in September 2013, the Debtor transferred a 2011 Cadillac Escalade, worth $28,000, to Belisle III for no consideration.  The vehicle had not been included in the sale of Catco's assets to Recore Trading.

---

[3]  Belisle testified at his deposition that Recore Trading did not make checks payable to Catco "because he told me he was out business and that account didn't exist anymore."  He testified further that the checks were made payable to Belisle III instead of Catco, who was the seller of the assets, because "[t]hat's what he requested.  I didn't know I should have done otherwise."

On September 13, 2013, Recore Trading issued and delivered to Belisle III a $15,000 check as part of the second installment due under the P&S Agreement.  On September 17, 2013, Recore Trading issued and delivered to Belisle III two more checks, one for $2,500 and the other for $32,500, in order to pay the balance due on the second $50,000 installment.  The $32,500 check was deposited into the Debtor's bank account.  Like the earlier check, these three checks were made payable to Belisle III.

In September 2013, Belisle III gave cash to the Defendant in the amount of $7,314, which money she used to pay for the installation of a furnace in her home on September 25, 2013.  This money came from Recore Trading's September 2013 payments.  At the time of the transfer, the Debtor did not owe Anderson any money.

As of September 25, 2013, the Debtor owed money to three creditors, Alpha Recycling, Zoulias, and RAS, totaling at least $118,819.  As of that same date, the Debtor's assets totaled either $66,443 or $81,443.[4]

The Debtor filed a chapter 7 bankruptcy petition on May 20, 2014.  On July 3, 2014, the Debtor filed its schedules and statement of financial affairs.  In response to Item 10, titled "Other transfers," in the Debtor's Statement of Financial Affairs, the Debtor indicated as follows:

**10. Other transfers**

None ☐  a. List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
| --- | --- | --- |
| Transferee: Recore Trading Co., LLC<br>Address:<br>Relationship: Recore is owned by member Donald Belisle's father | 7/12/13 bill of sale date; 9/18/13 tax return sched. | Property: sale of assets - see attached bill of sale dated 7/12/13 & tax return schedule shows sale date as 9/18/13 Value: $150,000, $100,000 paid and $50,000 balance due; also see two attached summaries of assets transferred and 2012 and 2013 Form 4797 |

---

[4]  The Trustee contends the Debtor's assets were worth $66,443 while Anderson contends the assets were worth $81,443.  This dispute is not material because Anderson acknowledges the Debtor was insolvent as of September 25, 2013.

*Transferee:Jean Anderson*
*Address: 28 Sullivan Court,*
*Salem, NH*
*Relationship:mother of sole*
*member/manager*

*9-25-2013*

*Property: Don Belisle purchased a furnace for his mother with proceeds from the sale of Catco*
*Value:$7,314 from Londonderry Plumbing and Heating -- receipt attached*

The Debtor included with its Statement of Financial Affairs the following itemization of the

assets sold to Recore Trading:

### LIST OF ITEMS SOLD TO DON BELISLE III'S FATHER'S COMPANY RECORE TRADING CO., LLC

### PER JULY 12, 2013 BILL OF SALE FOR $150,000.00, $100,000.00 OF WHICH WAS RECEIVED

| ITEM | EST. VALUE | 2013 RETURN VAL |
|---|---|---|
| 2001 PETERBILT DUMP TRUCK (new $12th body) | $50,000.00 | $21,099.00 |
| 2005 ISUZU BOX TRUCK | $12,000.00 | NOT LISTED |
| NISSAN FORK LIFT | $18,000.00 | $ 4,719.00 |
| BAILER | $ 6,000.00 | $ 4,443.00 |
| CAT SHEAR | $30,000.00 | $18,000.00 |
| WIRE STRIPPER | $ 1,500.00 | $ 5,000.00 (for equip) |
| 11 SECCO BINS ($1,500 EACH) | $16,500.00 | " |
| 10 WIRE BINS ($200 EACH) | $ 2,000.00 | " |
| 20 BLACK BINS ($75 EACH) | $ 1,500.00 | " |
| COMPUTERS AND SECURITY EQUIPMENT | $ 2,000.00 | $ 837.50 |
| FURNITURE | $ 1,500.00 | $ 494.00 |
| TRAILER | $ 3,500.00 | $ 2,015.00 |
| CUSTOMER LISTS | | NOT LISTED |
| COMPANY NAME AND RIGHTS | | NOT LISTED |

Based on this itemization, the Debtor estimated that the value of the items transferred totaled

$144,500, not including the customer lists and the company name and rights.

On November 17, 2014, the Trustee sought the return of the $7,314 transfer from Anderson.  When Anderson failed and refused to return the transfer to the Debtor's bankruptcy estate, the Trustee filed this adversary proceeding.

To the extent further facts are disputed, they will be discussed below.

### C.  Analysis

In order to recover on each of the Trustee's claims in Counts I through V of the Complaint, the Trustee must establish a common element, i.e., that the transfer he seeks to avoid was of an "interest of the debtor in property."[5]  11 U.S.C. §§ 544(b) and 548(a)(1); see Notinger v. Migliaccio (In re Fin. Res. Mortg., Inc.), 469 B.R. 487, 500 (Bankr. D.N.H. 2012) (citing Daly v. Kennedy (In re Kennedy), 279 B.R. 455, 459 (Bankr. D. Conn. 2002)).  The Trustee has the burden of proving this element of his claims.  Fin. Res. Mortg., 469 B.R. at 500.

"The Bankruptcy Code does not define the phrase 'an interest of the debtor in property.' Courts have concluded, however, that the term is equivalent to the term 'property of the estate' under 11 U.S.C. § 541.  Courts turn then to § 541 in order to determine the scope of property interests that are recoverable under §§ 544, 547, and 548.'"  Id. at 500-01 (citations omitted). "Money held in a bank account in the name of the debtor is presumed to be property of the

---

[5]  Section 548(a)(1) of the Bankruptcy Code, which forms the basis of Counts I and II, states in pertinent part and with emphasis added:

> The trustee may avoid any transfer … of an interest of the debtor in property … or any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition … .

11 U.S.C. § 548(a)(1).  Section 544(b)(1) of the Bankruptcy Code, which forms the basis of Counts III, IV, and V, states in pertinent part and with emphasis added:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law … .

11 U.S.C. § 544(b)(1).

estate. To rebut this presumption, a party must show that it retained some rights to the funds." Id. at 502 (citations omitted).

In this case, it is undisputed that the money that Belisle III gave to his mother to buy a new furnace came from a check dated September 17, 2013, from Recore Trading, made payable to Belisle III at his request, which was deposited into the Debtor's bank account. Anderson disputes, however, that this money was Catco's and instead contends that the money belonged to her son personally. Anderson argues that there is a genuine dispute regarding whose money was transferred, which precludes the granting of summary judgment.

In support of Anderson's position that the funds she received were her son's personal funds, she cites to an excerpt from the deposition of her son taken on September 22, 2014. When Belisle III was asked about the source of the funds he transferred to his mother, he responded that it was "[m]y own money that I had." However, Anderson's attorney indicated at the summary judgment hearing that Anderson does not contend that the money used to purchase the furnace came from Belisle's own "stash of money" or from the money he was then earning as an employee of Recore Trading; she acknowledges that the ultimate source of the funds was money received from Recore Trading.[6] Instead, she contends that Belisle III was personally entitled to a portion of the sale proceeds, i.e., that the sales proceeds were to be allocated between Catco and Belisle III, even though the P&S Agreement contains no statement or suggestion that the purchase price was to be allocated between them.[7]

---

[6] This is supported by Belisle III's testimony at his 341 meeting held on July 1, 2014, where he stated that the money he gave to his mother, he "took it out of the LLC" and it "came from selling the assets to my father."

[7] In addition, Anderson argues that the Debtor was not a party to or a named signatory of the P&S Agreement executed on July 12, 2013. The Court is not persuaded that the Debtor was not a party to the P&S Agreement because, as Anderson argues, the seller was listed as "Donald Belisle III (Catco Recycling)" and the P&S Agreement was signed by "Donald Belisle III" as "Seller." Upon review of the

Anderson argues that there was "confusion" over who were the parties to the P&S Agreement, how the purchase price was to be allocated, to whom the purchase monies were to be allocated initially, and how they were to be allocated under the contemplated final agreement mentioned in the P&S Agreement.[8]  In support of her position, Anderson points to excerpts from the deposition testimony of Belisle and Belisle III where counsel and the parties refer to the both the "seller" and "buyer" by their principals' individual names, Belisle and Belisle III, and not as Recore Trading and Catco.  Reviewing this testimony as a whole, the Court concludes that these references reflect nothing more than the fact that the respective companies were operated by Belisle and Belisle III as their sole members, and thus it was natural for them and their attorneys to refer to the companies in that manner.  These references do not create a "genuine" dispute as to who was buying and selling the assets.

Anderson further argues that what was being purchased by Recore Trading "was not so much Debtor's assets, but rather a renewed relationship" between Belisle and Belisle III, who reportedly had a rocky relationship in the past.  She contends that "there was a lack of valuable assets" being sold by the Debtor.  Anderson's bald assertions are not supported by the summary judgment record.

First, the P&S Agreement provides that $150,000 was to be paid for Catco's assets, which it lists as "Peterbilt dump truck, Isuzu box truck, Nissan fork lift, Baler, Cat shear, wire stripper misc containers and shelving, customer lists, company name and rights."  The P&S

---

P&S Agreement as a whole, which the Court notes was drafted by Belisle, a non-lawyer, and the testimony of Belisle and Belisle III contained in the summary judgment record, it is clear that the parties intended Recore Trading to buy the assets listed in the P&S Agreement, which were all owned by Catco, for $150,000.  There is no "genuine" dispute regarding this.

[8] Anderson also makes much of the fact that the P&S Agreement provided that it was "preliminary" and would "be superseded by final agreement when it is prepared by buyer[']s attorney."  The parties agree that no final agreement was ever executed.  Therefore the P&S Agreement has not been superseded.

Agreement makes no mention that anything else is being sold.  Further, the Debtor stated in response to Item 10 on the Statement of Financial Affairs that it sold assets on July 12, 2013, for $150,000, and the Debtor attached an itemization of those assets to its Statement of Financial Affairs.  This itemization shows a total estimated value of $144,500 for the assets, without giving any value for the Debtor's customer lists and company name and rights.  Thus, the Debtor's own statements under oath do not support Anderson's contention that there was confusion among the parties as to who was purchasing what and whether any of the purchase price was to be allocated to Belisle III.

Second, Belisle III's testimony at the Debtor's 341 meeting also does not support Anderson's position that there is a "genuine" dispute as to whether Belisle III was entitled to any funds.  When asked how the $150,000 purchase price was arrived at, Belisle III testified that the $150,000 price was based on "what we thought the equipment was worth and what my customers were worth."  Belisle III made no statement or contention that he personally was entitled to any of the sales price or that any of the $150,000 price should be attributed to his future services as an employee of Recore Trading.

Belisle III further testified at the 341 meeting that if he had sold the Debtor's business in the open market, the Debtor would have received more than $200,000.  He stated additionally that "I think I could have got more if I sold it privately, yes."  He explained that "one of my Peterbilt trucks was worth more than $50,000 bucks and I sold equipment to him that just my shear was worth $30,000."  He also stated that "I gave him I think 12 dumping containers and I bought them new for—I mean $2,000 apiece."  Nowhere during this discussion did Belisle III assert (as Anderson alleges) that he personally was entitled to any of the sale proceeds on account of his becoming a buyer for Recore Trading or on account of his father's desire to renew his relationship with his son.

Third, Belisle III's September 22, 2014, deposition testimony does not help Anderson. On that date, Belisle III testified that Recore Trading still owed Catco $50,000. He explained that the money was for "the equipment that he bought from me." He indicated "the bonus that was just thrown in was the customers." Nowhere in this discussion did Belisle III mention that he personally was entitled to any of the remaining sales proceeds on account of his own personal services or for the renewal of his relationship with his father, as argued by Anderson. Belisle III explained that "I got $2,000 salary a week," which was the agreed-upon salary "over and above the purchase price," for the services he provided as a buyer for Recore Trading beginning in July 2013. Thus, to the extent Anderson alleges that part of the purchase price should have been allocated to Belisle III on account of the personal services he was to render as an employee of Recore Trading, Belisle III himself testified that he was paid separately for those services.

Fourth, Belisle testified about the sale of Catco's assets to Recore Trading at his deposition on August 28, 2014. At the deposition, Belisle reviewed the P&S Agreement and acknowledged that he had drafted it, as this "was a significant monetary transaction" and it just made "good business sense." He described the P&S Agreement as "pertaining to the purchase of certain assets of Catco by me." Belisle indicated that Belisle III wanted a lot more than $150,000 for the assets. Initially he wanted $250,000, but they negotiated. In Belisle's mind, "the assets didn't justify the price, but the potential new business with customers coming in, I justified the price of $150,000."[9] There was no mention during this portion of the deposition that part of the consideration for Recore Trading's purchase was a renewed relationship between Belisle and his son or his son's agreement to come work for Recore Trading. Belisle testified

---

[9] Based on Belisle's deposition testimony, Anderson contends that the assets Recore Trading purchased were not worth much. This testimony is contradicted by Belisle III's testimony. However, even if Recore Trading ultimately concluded that the assets were not worth much, their immaterial worth does not mean that the money that Recore Trading paid should be treated as Belisle III's personal funds. Perhaps Recore Trading made a bad business deal.

that the "the part that I really wanted was the customers." Later during the deposition, Belisle acknowledged that Recore Trading did not pay the full purchase price in accordance with the P&S Agreement. He testified that "I'd be happy to pay the full amount if I got what I bought, the customers and him working for me. He was a very good buyer. Part of this agreement was I was going to get all his suppliers and he was going to work for me as a buyer. … When he walked out the door, he took his suppliers and he's gone. I don't want him now, but that was a significant part of the purchase price." This statement might support Anderson's contention that part of the consideration was Belisle III's agreement to work for his father's company, but it ignores other evidence in the record that Recore Trading was paying Belisle III a separate salary for that work.

Belisle also testified that he made additional payments to Belisle III: "He told me he was trying to pay his bills, in addition to his pay [Belisle III] needed more money, so I was giving him an extra thousand dollars every week he told me he was paying his bills with, and was to be deducted from the final payment … the final 50,000." Belisle described these payments as "goodwill" payments. Belisle testified that "[w]hat we paid toward the business was [$]127,000 and change." In Belisle's view the unpaid balance due under the P&S Agreement was only $23,000. Again, during this questioning at his deposition, Belisle never indicated that a portion of the $150,000 purchase price was to be allocated to Belisle III personally.

Thus, while Anderson argues that the purchase price should be allocated between Catco and her son, because Belisle testified that part of what he was buying was "the customers and him working for me," the summary judgment record reveals that Belisle III was paid separately for his services at the rate of $2,000 per week.

Finally, filings in Belisle III's own chapter 13 bankruptcy case filed on May 20, 2014 (Bk. No. 14-11022-BAH) do not support Anderson's contentions. In response to Item 10 in his

Statement of Financial Affairs, Belisle III listed the transfer to Recore Trading stating he "believes, per his accountant that the assets sold were Catco's" (emphasis added). In addition, Belisle III's Statement of Financial Affairs lists Belisle III as having received only $15,000 from Recore Trading in 2013, which amount was listed in response to Item 1, under the category of "Income from employment or operation of business." This $15,000 can be attributed to the $2,000 per week in salary payments Belisle III received between July 12, 2013, and the date Belisle III ceased working for Recore Trading in the fall of 2013. Belisle III did not otherwise list or identify any other money as having been received by him from Recore Trading pursuant to the P&S Agreement.

While Anderson contends there was confusion over how the purchase price was to be allocated, the summary judgment record does not bear out her bald assertion. Rather, Anderson's contentions are inconsistent with the Debtor's bankruptcy filing, Belisle III's testimony from the Debtor's 341 meeting and his deposition, and Belisle's testimony from his deposition. These statements, under oath, do not reveal any discussion that the $150,000 sales price outlined in the P&S Agreement was to be allocated between Catco and Belisle III personally. Belisle III clearly thought the assets being sold were worth $150,000 (and even more according to his testimony). The Debtor's Statement of Financial Affairs also supports the $150,000 value with a detailed listing of the items being sold. While Belisle's testimony indicates that he did not believe that the physical assets supported the $150,000 sales price but instead believed the real value was in obtaining the Debtor's customers, the Debtor's customer list was an asset of the Debtor, and not of Belisle III. Therefore, to the extent the sales price should be allocated between the physical assets and obtaining the customer list, the Debtor still would be the one entitled to receive the consideration for the customer list, not Belisle III personally.

14

Thus, even reviewing the record in the light most favorable to Anderson, and indulging all reasonable inferences in her favor, the record does not support a finding that some of the $150,000 purchase price should be allocated to Belisle III personally, let alone a genuine dispute as to that fact.  For that reason, Anderson has not demonstrated that a genuine dispute exists as to whether the money that Belisle III transferred to her was property of the Debtor.  As the First Circuit has recently stated, "'factually unsupported claims [and] defenses' are insufficient to withstand summary judgment."  Simmons, 2016 WL 234516, at *5 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) and citing Aponte-Rosario v. Acevedo-Vilá, 617 F.3d 1, 12 (1st Cir. 2010)).

Because there is no dispute whatsoever that the money transferred to Anderson came from the Debtor's bank account, which held the proceeds from the sale of Catco's assets, and because Anderson has not rebutted the presumption that this money was the Debtor's property, the Court finds that the Trustee has established the first element of each of his claims in Counts I through V of the Complaint, i.e., that the transfer he seeks to avoid was of an "interest of the debtor in property."

### 1.  Constructive Fraud – Counts II, IV, and V

The Trustee contends that the Debtor's transfer of money to Anderson was constructively fraudulent both under the Bankruptcy Code and New Hampshire state law.  In Count II, the Trustee contends that he can avoid the Debtor's transfer pursuant to 11 U.S.C. § 548(a)(1)(B)(i) and (ii)(I), which provide in relevant part:

> The trustee may avoid any transfer … of an interest of the debtor in property … that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

> (ii)(I) was insolvent on the date that such transfer was made or such obligation
> was incurred, or became insolvent as a result of such transfer or obligation.

11 U.S.C. § 548(a)(1)(B)(i) and (ii)(I).  In Count IV, he contends that he can avoid the Debtor's

transfer pursuant to 11 U.S.C. § 544(b)(1) and RSA 545-A:4(I)(b)(1).  Section 544(b)(1) of the

Bankruptcy Code provides:

> Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of
> the debtor in property … that is voidable under applicable law by a creditor holding an
> unsecured claim that is allowable under section 502 of this title or that is not allowable
> only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

> Section 544(b) of the Bankruptcy Code permits the avoidance of transfers that are
> voidable under applicable law by an unsecured creditor.  11 U.S.C. § 544(b); Official
> Committee of Unsecured Creditors v. Foss (In re Felt Mfg. Co., Inc.), 371 B.R. 589, 634
> (Bankr. D.N.H. 2007).  The "applicable law" referred to in 11 U.S.C. § 544(b) includes
> New Hampshire's version of the Uniform Fraudulent Transfer Act (the "UFTA") found
> in NH RSA 545-A.  Felt, 371 B.R. at 634.  Under UFTA, transfers may be found
> fraudulent if made under circumstances which, in the absence of actual fraud, are deemed
> fraudulent, i.e., "constructive" fraud claims under NH RSA 545-A:4(I)(b).  Felt, 371 B.R.
> at 635; Dahar v. Jackson (In re Jackson), 318 B.R. 5, 12 (Bankr. D.N.H. 2004).  "Unlike
> actual fraud, constructive fraud is essentially unconcerned with intent and instead focuses
> upon economic effect and involves an analysis of objective factors."  Felt, 371 B.R. at
> 635; see Jackson, 318 B.R. at 13, 18.

Notinger v. Brown (In re Brown), 2008 BNH 006, 17-18.  The New Hampshire Uniform

Fraudulent Transfer Act (the "UFTA") provides in relevant part:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
> whether the creditor's claim arose before or after the transfer was made or the
> obligation was incurred, if the debtor made the transfer or incurred the obligation:
> > …
>
> > (b)      Without receiving a reasonably equivalent value in exchange for
> >          the transfer or obligation, and the debtor:
> >
> > > (1)      Was engaged or was about to engage in a business or a
> > >          transaction for which the remaining assets of the debtor
> > >          were unreasonably small in relation to the business or
> > >          transaction.

RSA 545-A:4(I)(b)(1).  In Count V, the Trustee contends that he can avoid the Debtor's transfer

pursuant to 11 U.S.C. § 544(b)(1) and RSA 545-A:5(I), the latter of which provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose
> claim arose before the transfer was made or the obligation was incurred if the debtor
> made the transfer or incurred the obligation without receiving a reasonably equivalent
> value in exchange for the transfer or obligation and the debtor was insolvent at that time
> or the debtor became insolvent as a result of the transfer or obligation.

RSA 545-A:5(I).

As the party seeking to avoid the transfer at issue, the Trustee bears the burden of proof

on each element and must discharge that burden by a preponderance of the evidence.  Braunstein

v. Crawford (In re Crawford), 454 B.R. 262, 271 (Bankr. D. Mass. 2011); Dahar v. Jackson (In

re Jackson), 318 B.R. 5, 23 (Bankr. D.N.H. 2004).

Anderson has not challenged the Trustee's assertion that at the time the challenged

transfer took place, the Debtor had creditors who held existing claims against it, e.g., RAS,

Zoulias, and Alpha Recycling.  Accordingly, to establish the voidability of the Debtor's transfer

under Counts II and V, which assert claims under § 548(a)(1)(B) and RSA 545-A:5(I), the

Trustee must establish substantively identical elements:

1. There was a transfer of an interest of Debtor in property.

2. The Debtor received less than reasonably equivalent value in exchange for the
   transfer.

3. The Debtor was insolvent on the date the transfer took place or as a result of the
   transfer.

To establish voidability under Count IV, which asserts a claim under RSA 545-A:4(I)(b)(1), the

Trustee must establish the first two elements outlined above as well as the following additional

element:

4. The Debtor was engaged or was about to engage in a business or a transaction for
   which its remaining assets were unreasonably small in relation to the business or
   transaction.

17

Anderson has not challenged the Trustee's proof on the elements of his claims under Counts II, IV, or V, except to the extent discussed earlier in this opinion, i.e., that the transfer of $7,314 to Anderson was not a transfer of property of the Debtor. However, the Court has determined that the Debtor did in fact transfer $7,314 to the Defendant on September 25, 2013. Thus, the first element has been established.

Second, the summary judgement record is clear that the Debtor received nothing of value in exchange for the Debtor's transfer. Belisle III simply gave the Debtor's money to his mother so that she could purchase a new furnace. The Debtor did not owe Anderson any money at that time.

Third, Anderson admitted at the summary judgment hearing that the Debtor was insolvent[10] at the time of the transfer. Its debts as of September 25, 2013, were greater than the fair value of its remaining assets.[11]

Fourth, to the extent the Debtor was still engaged in business as of September 25, 2013, its remaining assets were unreasonably small. Whatever assets remained in the Debtor's bank account and in its possession did not cover the Debtors' outstanding liabilities, as Anderson has admitted.

---

[10]  Insolvency is described under state law as follows:

    I.      A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

    II.     A debtor who is generally not paying his debts as they become due is presumed to be insolvent.

RSA 545-A:2(I) and (II). The Bankruptcy Code defines the term "insolvent" as "financial condition such that the sum of such entity's debts is greater than all of such entity's property at fair valuation," excluding property fraudulently "transferred, concealed, or removed" and property exempted under 11 U.S.C. § 522. 11 U.S.C. § 101(32).

[11]  The Debtor's debts totaled at least $118,819 while its assets totaled either $66,443 according to the Trustee or $81,443 according to Anderson.

Because the Trustee has established the required elements of his claims under §

548(a)(1)(B) and § 544(b) and RSA 545-A:4(I)(b)(1) and 545-A:5(I), summary judgment can be

entered in his favor on Counts II, IV, and V of the Complaint.  The Debtor's transfer of $7,314 to

the Defendant on September 25, 2013, can be avoided as a constructively fraudulent transfer.

### 2.  Actual Fraud – Counts I and III

The Trustee contends that the Debtor's transfer of money to Anderson was made with

actual fraudulent intent within the meaning of both the Bankruptcy Code and New Hampshire

state law.  In Count I, the Trustee contends that he can avoid the Debtor's transfer pursuant to 11

U.S.C. § 548(a)(1)(A), which provides:

> The trustee may avoid any transfer … of an interest of the debtor in property … that was
> made or incurred on or within 2 years before the date of the filing of the petition, if the
> debtor voluntarily or involuntarily—
>
>> A.  Made such transfer or incurred such obligation with actual intent to hinder,
>> delay, or defraud any entity to which the debtor was or became, on or after the
>> date that such transfer was made or such obligation was incurred, indebted.

11 U.S.C. § 548(a)(1)(A).  In Count III of the Complaint, the Trustee seeks to avoid the Debtor's

transfer pursuant to 11 U.S.C. § 544(b)(1) and RSA 545-A:4(I)(a).  The UFTA provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
> whether the creditor's claim arose before or after the transfer was made or the
> obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
>> (a)      With actual intent to hinder, delay, or defraud any creditor of the debtor.

RSA 545-A:4(I)(a).  The UFTA further explains:

> In determining actual intent under subparagraph I(a), consideration may be given, among
> other factors, to whether:
>
> (a) The transfer or obligation was to an insider;
> (b) The debtor retained possession or control of the property transferred after the transfer;
> (c) The transfer or obligation was disclosed or concealed;
> (d) Before the transfer was made or obligation was incurred, the debtor had been sued or
> threatened with suit;
> (e) The transfer was of substantially all the debtor's assets;

(f) The debtor absconded;
(g) The debtor removed or concealed assets;
(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(j) The transfer occurred shortly before or after a substantial debt was incurred; and
(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

RSA 545-A:4(II).

In addressing fraudulent transfers under § 548(a)(1)(A), the First Circuit Court of Appeals has explained that "[t]he transfer of any interest in the property of a debtor … is voidable by the trustee in bankruptcy if the purpose of the transfer was to prevent creditors from obtaining satisfaction of their claims against the debtor by removing the property from their reach.  It is often impracticable, on direct evidence, to demonstrate an actual intent to hinder, delay, or defraud creditors." Max Sugarman Funeral Home, Inc. v. ADB Investors, 926 F.2d 1248, 1254 (1st Cir. 1991) (citations omitted); see also AngioDynamics, Inc. v. Biolitec AG, 910 F.Supp.2d 346, 352 (1st Cir. 2012).  The First Circuit further explained that "courts applying Bankruptcy Code § 548(a)(1) frequently infer fraudulent intent from the circumstances surrounding the transfer, taking particular note of certain recognized indicia or badges of fraud.  Among the more common circumstantial indicia of fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer." Id. (citations omitted) (emphasis in original).  The First Circuit expounded that while the presence of a single badge of fraud "may spur mere suspicion, the confluence of several can constitute

20

conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." Id. at 1254-55 (citations omitted).

The Trustee asserts that the Court can infer the Debtor's fraudulent intent from the following badges of fraud: (1) Catco removed nearly all its assets when it sold them to Recore Trading on July 12, 2013, pursuant to the P&S Agreement; (2) the Debtor's principal withdrew the initial $50,000 payment from Recore Trading to purchase a truck, taking title in Belisle III's own name; (3) the Debtor received no value at all for the transfer to Anderson; (4) the Debtor was insolvent at the time of the transfer to Anderson; (5) the transfer occurred shortly after the Debtor had executed the advance and security agreement with RAS, with the security agreement postdating the P&S Agreement; (6) the Debtor had been threatened with litigation by Zoulias; and (7) Anderson was an "insider" within the meaning of the Bankruptcy Code, as she is a relative of Belisle III, the person in control of the Debtor.  See 11 U.S.C. § 101(31)(B)(vi).

While the Court may agree that these factors constitute badges of fraud under both federal and state law, the Court does not find that they clearly establish on this summary judgment record that the Debtor had fraudulent intent when it transferred money to the Defendant.[12]  Finding fraudulent intent is a finding of fact.  Max Sugarman, 926 F.2d at 1255. "[W]here there is an issue as to a person's intent, it is very difficult to determine that issue in a summary manner without the benefit of a trial where the Court can weigh the credibility of the defendant and other witnesses or parties to the proceeding."  Gen. Motors Acceptance Corp. v.

---

[12]  Instead, reviewing the summary judgment record in the light most favorable to Anderson, the Court could conclude that the Debtor did not make the transfer to its principal's mother in an attempt to defraud Catco's creditors, but rather it did so at Belisle III's direction simply because Belisle III was treating corporate assets as his own.  Because the record could support a finding that Belisle III disregarded corporate formalities, perhaps in breach of his fiduciary duties as the sole member of the Debtor, the Court cannot grant summary judgment for actual fraud.  When the summary judgment record permits the Court to make conflicting inferences, "the choice between those inferences cannot be made at the summary judgment stage."  Morse v. Jarvis (In re Jarvis), 2005 BNH 027, 5.

Bartlett (In re Bartlett), 154 B.R. 827, 829 (Bankr. D.N.H. 1993); see also Morse v. Jarvis (In re Jarvis), 2005 BNH 027, 6.  "[S]ummary judgment is granted sparingly where … issues of the defendant's intent and knowledge are raised."  Bartlett, 154 B.R. at 829.  "[I]t is almost axiomatic that fraudulent intent is uniquely not susceptible to resolution 'on papers.'"  A.T. & T. Universal Card Servs. v. Burns (In re Burns), 196 B.R. 11, 13 (Bankr. W.D.N.Y. 1996).

Reviewing the summary judgment record in the light most favorable to Anderson, the Court is unable to conclude that the Debtor had actual fraudulent intent when it transferred money to the Defendant.  Accordingly, the Court must deny summary judgment with respect to Counts I and III of the Complaint.

### 3.  Recovery of Avoided Transfer – Count VI

In Count VI of the Complaint, the Trustee seeks to recover the value of any transfer avoided in Counts I through V of the Complaint in accordance with the provisions of 11 U.S.C. § 550.[13]

> Section 550 of the Bankruptcy Code establishes from whom a trustee may recover fraudulently transferred assets.  Richardson v. United States (In re Anton Noll, Inc.), 377 B.R. 875, 878 (B.A.P. 1st Cir. 2002).  "Section 550(a)(1) provides that the trustee may recover fraudulently transferred property or its value from the 'initial transferee … or the entity for whose benefit such transfer was made.'"  Id.  Initial transferees are strictly liable; the trustee may always recover from the initial transferee regardless of the transferee's good faith, value, or lack of knowledge of the voidability of the transfer.  Id. (citing Rupp v. Markgraf, 95 F.3d 936, 938 (10th Cir. 1996)).

---

[13]  Section 550(a) of the Bankruptcy Code specifically provides:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

Gordon v. Vilela (In re Vilela), 2014 BNH 015, 10-11.

The Defendant was the initial transferee of the Debtor's transfer of $7,314.  Belisle III took sale proceeds from Catco's bank account and gave this property of the Debtor to his mother. As the initial transferee, Anderson is strictly liable under § 550(a)(1) and must return the money transferred.  Accordingly, summary judgment can be granted with respect to Count VI of the Complaint, and the Trustee may recover the funds transferred to the Defendant for the purchase of her furnace in the amount of $7,314.

## III.  CONCLUSION

For the reasons outlined above, the Court will issue a separate order granting the Motion with respect to Counts II, IV, V, and VI of the Complaint and denying the Motion with respect to Counts I and III.

ENTERED at Manchester, New Hampshire.


Date:   February 10, 2016                    /s/ Bruce A. Harwood
                                             Bruce A. Harwood
                                             Chief Bankruptcy Judge